# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Keith L. Harris,

        Plaintiff,

        v.

FedEx Freight, Inc., *et al.*,

        Defendants.

Case No. 13 C 8378

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

This is an employment discrimination action that arises from the August 28, 2012 termination of Plaintiff Keith Harris, a black driver at FedEx Freight. In his six-count Second Amended Complaint [20], Plaintiff alleges that FedEx Freight and four white supervisors (a fifth supervisor was dismissed for lack of personal jurisdiction [41]) discriminated against Plaintiff based on his race, retaliated against him for engaging in protected activity and denied him certain statutory benefits.

Defendants now move for summary judgment [66] on all six counts. That motion is granted in part and denied in part.

## I. Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party, here, Plaintiff. *See CTL ex rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014).

## II.    Facts[1]

### A.    Parties

Plaintiff is a black male. DSOF ¶ 4. On July 5, 2006, Plaintiff began working at FedEx Freight as a Dock Worker at the Aurora Service Center in Aurora, Illinois. DSOF ¶ 10. Soon thereafter, in the following months, FedEx Freight promoted Plaintiff first to Driver Apprentice and then to City Driver. DSOF ¶¶ 10-11. It appears that Plaintiff remained a City Driver until August 28, 2012, when he was terminated.

Defendant FedEx Freight is a package shipping company. The four individual Defendants, who are all white, held supervisory roles at FedEx Freight. At all relevant times and beginning in November 2006, Defendant Robert Vande Hei (white) was the Service Center Manager at the Aurora Service Center. DSOF ¶¶ 7, 12. Mr. Vande Hei supervised Operations Managers, including Defendant

---

[1] The facts are taken from the parties' Local Rule 56.1 statements. "DSOF" refers to Defendants' statement of undisputed facts [69], with Plaintiff's responses [83]. "PSOAF" refers to Plaintiff's statement of additional facts [83], with Defendants' responses [87].

Kevin McCready (white), and Operations Supervisors, including Defendant David Mills (white). DSOF ¶¶ 8-9, 12. Operations Supervisors work in the Dispatch Office where they monitor drivers' locales throughout the day by computer and communicate with the drivers about nearby pick-ups when customers call. DSOF ¶ 13. Stuart Baxter (black) served as a HR Advisor until January 30, 2011, at which time Defendant Roger Maco (white) took over the position. DSOF ¶¶ 6, 12, 14.

### B. Work Environment

Plaintiff alleges that during his tenure at FedEx Freight, supervisors created a hostile work environment. The supervisors, for example, levied racial epithets against Plaintiff and gave him undesirable job assignments. For brevity, this Court will discuss this conduct in connection with Plaintiff's hostile work environment claim (*see* Section III.A) and not repeat that discussion here.

### C. Discharge and Injury

Plaintiff's termination purportedly arises from two Compensated Time Violations over a five-month period in 2012. A Compensated Time Violation is when an hourly employee is "on-the-clock" and supposed to be working but is not. DSOF ¶ 25. According to FedEx Freight's Employee Handbook, a Compensated Time Violation can result in discharge. DSOF ¶ 27. Mr. Maco, the HR Advisor, explained that the Employee Handbook guidelines were not "absolute" and that, in practice, HR typically: issued a so-called "Critical Corrective Action" (a written write-up) for violations less than 15 minutes and where the employee had no prior infractions; issued a Critical Corrective Action plus a three-day suspension for

3

violations between 15 and 30 minutes; and terminated employees for violations greater than 30 minutes. Maco Dep. at 102-04; *see also* DSOF ¶ 26.

The morning of March 29, 2012, when Plaintiff arrived to work, Mr. Mills assigned him to take a tractor trailer and drive to the Elmhurst Service Center, DSOF ¶ 21; Mills Dep. at 74-75, which is located in Elmhurst, Illinois. The parties dispute the motivation for this assignment. Defendants claim that the Elmhurst Service Center required additional help that day, DSOF ¶ 21, whereas Plaintiff argues that the assignment was intended as punishment because the supervisor there, Annette Felber, had discriminated against Plaintiff in 2009, when Ms. Felber was working at the Aurora Service Center, Response to DSOF ¶ 21; PSOAF ¶ 19.

For a drive that typically takes 45 minutes, it took Plaintiff one hour and 48 minutes to reach the Elmhurst Service Center. DSOF ¶ 24. Plaintiff attributed the delay to him getting lost (despite having made requests for directions) and road construction. PSOAF ¶ 21.

Based on the delay and Plaintiff's explanation, Mr. Maco, his boss Brian Jenkins and Mr. Vande Hei issued Plaintiff a Critical Corrective Action and a three-day suspension. DSOF ¶ 26; Maco Dep. at 104. Mr. Maco testified that FedEx Freight could have fired Plaintiff, as allowed by the Employee Handbook, but Management and HR gave Plaintiff the benefit of the doubt given his explanation for the delay. DSOF ¶¶ 27-28; Maco Dep. at 104. The Critical Corrective Action issued to Plaintiff stated that future infractions would result in further discipline, up to and including termination. DSOF ¶ 29. Plaintiff unsuccessfully appealed the

Critical Corrective Action through the company's internal appeals process. DSOF ¶ 30.

Plaintiff incurred a second Compensated Time Violation for events occurring on August 15, 2012. DSOF ¶ 33. On that day, Plaintiff asked Joe Paoletti, an Operations Supervisor, for permission to go to a cell phone store over his lunch break, and Mr. Paoletti agreed. DSOF ¶ 33. This is where the parties diverge in their version of the events.

Defendants principally rely on the narration of events from Mr. Maco's undated Corrective Action Recap. *See* DSOF ¶¶ 33-38 (citing Corrective Action Recap [73]). (The Corrective Action Recap has what appears to be an August 30, 2012 fax stamp, suggesting that the document was prepared on or before that date.) According to the Recap, Plaintiff stopped at a Sprint store during his lunch break, which Plaintiff took from 2:29 to 2:59 p.m. DSOF ¶ 33. Sometime later, Mr. Paoletti then sent Plaintiff an Intermec message instructing him to visit a customer to pick-up freight that needed to go out on an outbound trailer at Aurora Service Center that evening. DSOF ¶ 34. FedEx Freight issued City Drivers, including Plaintiff, a handheld device called an "Intermec" so they could communicate with their Operations Supervisors while on the road. DSOF ¶ 15.

Turning back to the timeline, Plaintiff completed a stop at 6:51 p.m., about 22 minutes away from the new assignment. DSOF ¶ 34. At 7:00 p.m., Mr. Paoletti sent a second message reminding Plaintiff to "come home" after the assigned pick-up. DSOF ¶ 35. Plaintiff did not respond, so at 7:29 p.m., Mr. Paoletti sent another

message: "Freight on your trailer needs to service." DSOF ¶ 35. Still no response. DSOF ¶ 36. At 7:41 p.m., Mr. Paoletti sent another message: "Are you at the Sprint store?" DSOF ¶ 36. Plaintiff again did not respond but made the pick-up at 7:42 p.m. DSOF ¶ 36. Three minutes later, at 7:45 p.m., Mr. Paoletti sent yet another message: "Come home and see Q [Operations Manager Quintin Hammitte] when back." DSOF ¶ 36. The shipment ultimately missed its connection at Aurora Service Center by the time Plaintiff returned. DSOF ¶ 37. Mr. Hammitte (black) asked Plaintiff for a written statement. DSOF ¶ 37. Plaintiff did not give a written statement, explaining that he would not write one off-the-clock. Response to DSOF ¶ 37.

Plaintiff is correct that the Corrective Action Recap quotes statements not made by the author (Mr. Maco). Responses to DSOF ¶¶ 33-38, 44. Thus there may be hearsay hurdles that Defendants must first clear if they seek to introduce the Recap at trial. But those hurdles are inapplicable here. As discussed in connection with Plaintiff's termination claim (*see* Section III.B), this Court does not need to consider the Corrective Action Recap for its truth, but rather considers it as the purported basis for Defendants' decision to terminate Plaintiff. *See* Fed. R. Evid. 801(c)(2).

As for Plaintiff's version of the August 15, 2012 events, Plaintiff generally testified that he was performing his job duties at all relevant times. PSOAF ¶ 25. As for not responding to Mr. Paoletti's messages, Plaintiff explained that his Intermec was freezing up that day, so he received some messages, but perhaps not

others, and the messages he did receive were delayed. Responses to DSOF ¶¶ 42-43. Plaintiff testified that he reported the problems with his Intermec to Mr. Paoletti sometime on August 15, 2012 and also complained to Mr. Paoletti about the same Intermec not working "through that week." Responses to DSOF ¶¶ 42-43; Harris Dep. at 182.

Management at Aurora Service Center began investigating Plaintiff for a possible Compensated Time Violation for the late pick-up on August 15, 2012. DSOF ¶¶ 38-40. Among other things, they ran a GPS "bread crumb trail" on Plaintiff's trailer. DSOF ¶ 38. In 2011, FedEx Freight, with the knowledge of its employees, began installing GPS tracking units on its tractor trailers. DSOF ¶ 16. Management determined that the trailer was stationary for 29 minutes, from 7:04 to 7:33 p.m., near the Sprint store Plaintiff had visited over his lunch break; and further that it took 41 minutes (after taking into account Plaintiff taking a 10 minute break, as he was entitled to do) from his previous stop to make the assigned pick-up, when that drive should have taken only 26 minutes. Corrective Action Recap [73] at 3; DSOF ¶ 38. Management prepared written statements and gathered other documents, including MapQuest drive times to confirm the appropriate driving times for Plaintiff's driving routes that day. Corrective Action Recap [73]; DSOF ¶¶ 38, 40.

On August 20, 2012, Plaintiff met with Management and HR, namely, Mr. Maco, Mr. McCready, Mr. Paoletti and Mr. Vande Hei. DSOF ¶ 41; *see also* Harris Dep. at 173-74; Vande Hei Dep. at 262-63. Plaintiff explained his version of the

events, as discussed above. Plaintiff said he took a 10-minute break during the 29 minutes his truck was stationary but failed to account for the other 19 minutes. DSOF ¶ 44. Plaintiff also explained that his Intermec had malfunctioned and he had to "wave it in the air" to receive messages. DSOF ¶¶ 41, 43.

The file for Plaintiff's termination includes a report for Plaintiff's Intermec on August 15, 2012. Mills Dep. at 81. The record does not show who, if anyone, at FedEx Freight reviewed the report before the decision to terminate Plaintiff was made. *See* Response to DSOF ¶ 42. At his January 21, 2015 deposition in this case, Mr. Mills said he previously saw this report, although he did not say when. Mills Dep. at 81. Mr. Mills explained that the report showed that Plaintiff's Intermec was receiving messages promptly on August 15, 2012; the report showed a short time lag of less than one minute between when message were sent to and received by the device. DSOF ¶ 42; Mills Dep. at 84-85. Somewhat consistent with that testimony, at his deposition, Plaintiff acknowledged receiving some of Mr. Paoletti's August 15, 2012 messages, albeit with a purported time lag. DSOF ¶ 43.

When Plaintiff stepped out of the August 20, 2012 meeting with Management and HR, he went to the Aurora Service Center Dock and called Mr. Baxter, the former HR Advisor, on his cell phone. DSOF ¶ 49. While speaking with Mr. Baxter, Plaintiff fell over a fork lift and sustained injuries. DSOF ¶¶ 49-50; Work Status Instruction Sheets [73] [83-11].

Also on August 20, 2012, Plaintiff was treated at Provena Mercy Medical Center and released the same day. DSOF ¶ 50. The Medical Center issued Work

Status Instruction Sheets on August 20 and 23, 2012. Work Status Instruction Sheets [73] [83-11]; *see also* Response to DSOF ¶ 50 (citing Harris Dep. 409-19); PSOAF ¶ 27. The Instruction Sheets contained two categories of fields for when the patient could or could not return to work. The Instruction Sheets contain seemingly conflicting information, and the parties naturally disagree whether these Instruction Sheets in fact released Plaintiff to work. DSOF ¶ 50. The details of the Instruction Sheets are not relevant to this Memorandum Opinion and Order.[2]

Plaintiff has testified that on August 23, 2012, Mr. Vande Hei called him and asked him to return to work. Harris Dep. at 279; DSOF ¶ 51. Plaintiff testified that on an unknown date (perhaps also August 23), he gave Mr. Vande Hei a letter from Plaintiff's doctor (presumably the August 20 or 23, 2012 Work Status Instruction Sheet) stating that he could not return to work. Harris Dep. at 280-81. Mr. Vande Hei responded that Plaintiff should return to work to not undermine FedEx Freight's "injury quota." Harris Dep. at 280-81. For his part, Mr. Vande Hei testified that after receiving documentation from Plaintiff (perhaps the aforementioned letter), he asked Plaintiff to return to "light duty." Vande Hei Dep.

_____

[2] The August 20, 2012 Instruction Sheet includes the following boxes as checked: (1) under "Plaintiff may return to work with the following restrictions," "No Lifting Over 5 [pounds] [with] Right arm," "No pushing or pulling over 5 [pounds]," "No climbing vertical ladders," "No tight gripping with: Right hand," "No work involving use of: Right arm," "Ambulation as tolerated" and "Wear: Sling, Hard Splint"; and (2) under "Patient may not return to work," "Until follow up appointment." *See also* Harris Dep. at 413-16. This Instruction Sheet also includes a notation under "Additional Instructions." The notation includes the words "light duty," but the entire notation is not legible. *See also* Harris Dep. at 416. The August 23, 2012 Instruction Sheet includes the following boxes as checked: (1) under "Patient may return to work with the following restrictions," "No tight gripping with: Right hand" and "No work involving use of: Right arm"; and (2) under "Patient may not return to work," "Until specialist consulted." Under the "Additional Instruction" field, this Instruction Sheet appears to include the notation: "ortho [orthopedic] consult ASAP."

at 279-80; DSOF ¶ 51.  It is undisputed that Plaintiff did not return back to work before being terminated.  DSOF ¶¶ 51, 70.

In the same or in another conversation between August 20 and 28, 2012, according to Plaintiff, he told Mr. Vande Hei that he intended to file for workers' compensation and Mr. Vande Hei responded: "you need to come back, [or] else you can be fired."  Harris Dep. at 398; *see also* PSOAF ¶ 30.  According to Plaintiff, Mr. Vande Hei said that a new claim would "mess with our [the company's] numbers." Harris Dep. at 397; *see also id.* at 401-02.

Also at an unknown date, Mr. Vande Hei and two members of HR, Mr. Maco and his boss Mr. Jenkins made the final and unanimous decision to terminate Plaintiff.  DSOF ¶ 45.  FedEx Freight terminated Plaintiff's employment effective August 28, 2012.  Termination Letter [83-9]; DSOF ¶ 45.  The termination letter is from Mr. Maco and undated.  Termination Letter [83-9].  The letter refers to an attempt made by FedEx on August 29, 2012, as well as "several" subsequent attempts, to notify Plaintiff of his termination by phone.  *Id.*  Plaintiff received the termination letter on September 4, 2012.  9/5/12 Maco Email [83-10].  Plaintiff appealed this decision to FedEx Freight's Appeal Review Committee, and the appeal was denied.  DSOF ¶ 48.

### D.    Administrative History

The pleadings reveal no dispute that Plaintiff filed charges with the EEOC alleging at least race discrimination and that the EEOC issued a Notice of Right to Sue letter in August 2013.  Second Am. Compl. [20] ¶ 6; Answer [27] ¶ 6.  The

record does not contain these administrative materials or otherwise state when Plaintiff filed his charges. Neither party, however, raises any issues that necessitate addressing this gap in the record.

## III. Analysis

This Court analyzes Plaintiff's six categories of claims in turn, and grants Defendants' motion for summary judgment only with respect to Plaintiff's retaliation claim in Counts I and II.

### A. Hostile Work Environment (Counts I and II)

In Counts I and II, Plaintiff brings three categories of claims against all Defendants under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e, respectively. Claims under both statutes are analyzed in the same manner. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).

This Court first addresses Plaintiff's claim that he was subject to a hostile work environment. An employer may be liable for discrimination within the meaning of Title VII if an employee is subject to a hostile work environment based on race. To recover, Plaintiff must show that (1) his work environment was both objectively and subjectively offensive; (2) his race was the cause of the harassment; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability. *Yancick*, 653 F.3d at 544; *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). The conduct must be so severe or pervasive as to alter the conditions of employment such that there is an abusive working environment. *Scruggs*, 587 F.3d at 840. This Court must consider the totality of the

circumstances, including the severity of the discriminatory conduct, its frequency, whether it was physically threatening of humiliating or merely offensive and whether it unreasonably interfered with Plaintiff's work performance. *Scruggs*, 587 F.3d at 840; *Shanoff v. Illinois Department of Human Services*, 258 F.3d 696, 704 (7th Cir. 2001). Off-hand comments, isolated incidents and simple teasing are not enough. *Hobbs v. City of Chicago*, 573 F.3d 454, 464-65 (7th Cir. 2009); *Scruggs*, 587 F.3d at 840-41.

Under the first three elements, there is a triable issue of fact because Plaintiff has identified, among other evidence, repeat instances where his supervisors made tacit or explicit racial epithets. Plaintiff does not need to show that these comments (or the other complained-of conduct) were explicitly racial, but must show that they had a "racial character or purpose." *Yancick*, 653 F.3d at 544; *see also Shanoff*, 258 F.3d at 704.

Here, the alleged harassment began in fall 2011. Plaintiff had received a letter about increasing his 401(k) contribution, and Mr. Mills and Mr. Paoletti, two Operations Supervisors, said the letter looked like a child support letter. PSOAF ¶¶ 2-3. Mr. Paoletti followed that comment by asking Plaintiff how many "baby mamas" he had. DSOF ¶¶ 56, 58; PSOAF ¶ 2. Mr. Mills remarked that FedEx Freight had bought enough "chicken and watermelon" for the upcoming company picnic at Six Flags Great America (an amusement park). DSOF ¶ 57; PSOAF ¶ 3. The two supervisors added that Plaintiff could not bring his entire family to the

picnic. DSOF ¶ 57. Mr. McCready, an Operations Manager, was present for this conversation and joined in the laughter. Harris Dep. at 232, cited at PSOAF ¶ 3.

Fifteen minutes after the conversation concluded, Mr. Harris reported it to Mr. Vande Hei. DSOF ¶ 58. The parties dispute whether Plaintiff told Mr. Vande Hei that he viewed the comments from Mr. Mills and Mr. Paoletti as being about his race. *Compare* DSOF ¶ 58, *with* Response to DSOF ¶ 58 (citing Harris Dep. at 299). Plaintiff testified at his deposition:

> Q. And you didn't attribute it to your race when you complained about that to Robert Vande Hei, you didn't complain that it was a product of race discrimination, right?
>
> A. I guess you could say I didn't necessarily say it's the tone of my color, I guess. But I guess baby mamas they don't use with white people. I guess that's profiling me, right?

Harris Dep. at 299, cited at Response to DSOF ¶ 58.

Next, the weekend of the company picnic at Great America, David Yang, a Chinese-American employee, came to the dispatch office and heard Mr. Mills tell a dispatcher: "Are they going to have enough fried chicken for [Mr. Harris] and his kids." PSOAF ¶¶ 1, 3. Although Plaintiff was not present during this conversation, comments made by a supervisor outside the employee's purview can be used to support a hostile work environment claim. *Mason v. Southern Illinois University at Carbondale*, 233 F.3d 1036, 1041, 1045, 1047 (7th Cir. 2000) (allowing into evidence at trial the supervisor's comments made outside the employee's presence).

Plaintiff testified about a second conversation with Mr. Mills that appears to have occurred a few months later, in November 2011. PSOAF ¶ 4; *see* [84] at 4. FedEx was holding a turkey cookout for Thanksgiving, and Mr. Mills told Plaintiff

that the cookout was not an opportunity for Mr. Harris and his family to receive free turkeys. PSOAF ¶ 4.

Plaintiff also testified about a second conversation with Mr. Paoletti, although Plaintiff again did not recall exactly when the conversation occurred. PSOAF ¶ 6. Mr. Paoletti crumpled into a ball a letter Plaintiff was writing about a customer, gave the ball to Plaintiff to throw out and, in the process, laughed and remarked: "You're black? This is about you being black, right?" PSOAF ¶ 6; Harris Dep. at 239-40.

The next year, on June 26, 2012, Plaintiff had a call with Mark Courter, a safety manager, about a recent traffic citation Plaintiff had received while off-duty for driving 62 mph in a 55 mph zone. Maco Memo [83-20]. Early in the phone call, Mr. Courter asked Plaintiff whether he was black or white; Plaintiff responded that he was black. PSOAF ¶ 5. Mr. Courter commented that Plaintiff must have family and friends who get him off traffic tickets, which Plaintiff understood as a comment that the only reason Plaintiff could beat traffic tickets is because he had black friends in the court covering his back. PSOAF ¶ 5.

Within the next day, Plaintiff sent a letter (addressed to: "To whom it may concern") about the phone call. Harris Dep. at 147-48; Harris Letter [83-19]. Plaintiff said he felt judged and belittled by Mr. Courter. Harris Letter [83-19] at 1-3. Plaintiff added: "I felt this man was judgmental, prejudice [sic] and after he determined my race, he was racially profiling." Harris Letter [83-19] at 1. In response, on June 27, 2012, Mr. Maco, a HR Advisor, met with Plaintiff and

prepared an undated memo about the meeting. *See generally* Maco Memo [83-20].

According to the memo, Mr. Maco asked Plaintiff why he felt he was being

discriminated against, and Plaintiff responded:

> I was discriminated based on being belittled. He (referring to Mark
> Courter) was talking down to me. You (referring to me) did not stick
> up for me when he was doing that to me.

Maco Memo [83-20] (quoting Plaintiff and with parenthetical statements in the

memo). Mr. Maco found that the conversation had become combative and agreed

with Plaintiff that both Mr. Courter and Plaintiff could have handled the situation

better. Maco Memo [83-20]. Mr. Maco concluded by stating that his meeting with

Plaintiff ended positively. Maco Memo [83-20].

Under the circumstances, these tacit and explicit statements about Plaintiff's

race warrant denying summary judgment. "[R]epeated incidents of verbal

harassment that continue despite the employee's objections are indicative of a

hostile work environment." *Shanoff*, 258 F.3d at 704. As the Seventh Circuit found

in *Rodgers v. Western-Southern Life Insurance Co.*, 12 F.3d 668, 674-76 (7th Cir.

1993), while there is no magic number of incidents that create a hostile work

environment, just a few racial epithets can suffice in certain cases. The Court there

observed: "Perhaps no single act can more quickly alter the conditions of

employment and create an abusive working environment than the use of an

unambiguously racial epithet … by a supervisor in the presence of his

subordinates." *Rodgers*, 12 F.3d at 675 (internal quotations and citation omitted);

*see also Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)

(unambiguous racial epithets fall on the "more severe" end of the spectrum). The Seventh Circuit in *Rogers* ultimately affirmed a bench trial decision for the employee because the supervisors had used tacit ("You must think you're back in Arkansas chasing jack rabbits") and explicit (the n-word) racial epithets at least five times. *Rodgers*, 12 F.3d at 675.

Likewise, in *Fulmore v. M & M Transport Services, Inc.*, No. 11-389, 2012 WL 5331229, at *7-9 (S.D. Ind. Oct. 29, 2012), the Court denied summary judgment because the supervisors had made at least three racial epithets, calling the employee the n-word and a "black motherfucker" and remarking that "it was a cold day in hell on President Obama's inauguration day." Despite not knowing the exact number of racial epithets, the Court found the remarks so severe and offensive that they had sufficiently altered the terms and conditions of the employee's employment. *Id.* at *8.

Here, Plaintiff has identified nine arguably racial epithets during five conversations. While this Court agrees with Defendants that no single comment is as severe as those in *Rodgers* and *Fulmore*, *see* [86] at 7-8, given the Seventh Circuit's observation in *Rodgers* that no single act can more quickly alter the condition of employment than racial epithets, this Court cannot say that the comments here are not severe in context. Moreover, the comments here are more frequent than those in *Rodgers* and *Fulmore*. The more frequent the harassment, the less severe it needs to be to show "severe or pervasive" (element 3) conduct.

*Cerros*, 288 F.3d at 1047; *see also Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999).

Defendants also dispute the character of these comments (*i.e.*, whether they are in fact racially charged). [86] at 7-9. That argument also fails. Similar to the comments here about "baby mamas" and "fried chicken," the Courts in *Rodgers* and *Fulmore* found facially race-neutral comments, such as "You must think you're back in Arkansas chasing jack rabbits," to have racial undertones. *See also Smith*, 189 F.3d at 533. And, in the light of the explicit racial references and other conduct here, a reasonable jury might find that the facially race-neutral comments also were based on race when put in context. *See Shanoff*, 258 F.3d at 704-05; *Williams v. Phillips 66 Co.*, No. 13-96, __ F. Supp. 3d __, 2014 WL 5543826, at *13-14 (S.D. Ill. Nov. 3, 2014).

There is no dispute that Plaintiff has met the subjective component of element 2. All Plaintiff has to establish is that he perceived the environment to be hostile or abusive. *Haugerud v. Amery School District*, 259 F.3d 678, 695 (7th Cir. 2001). He has, as confirmed by Plaintiff reporting the fall 2011 and June 2012 comments to supervisors. At the summary judgment stage, this is enough. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476-77 (7th Cir. 2004).

Even if the racial epithets here were not sufficient by themselves, there is more. The record shows that supervisors may have denied Plaintiff privileges, and given him worse job assignments, because of his race.

According to Plaintiff, Mr. Vande Hei denied Plaintiff time off to attend to his sick mother. PSOAF ¶ 9. Lavelle Tyler, also a black driver, similarly testified that Mr. Vande Hei denied him time off to attend his son's graduation from the U.S. Naval Academy. PSOAF ¶¶ 1, 9. By comparison, Plaintiff testified that Mr. Vande Hei afforded this very same privilege to white employees, even those with less seniority than Plaintiff. Harris Dep. at 62. Plaintiff gave one example where a white truck driver missed work to attend his daughter's basketball game, yet Mr. Vande Hei excused the violation without any reprimand. PSOAF ¶ 9.

Plaintiff also has marshaled sufficient evidence to create a material issue of fact as to whether he was assigned undesirable route assignments because of his race. Richard Davila, a dock supervisor who saw trucks come in and out of the dock and knew which drivers were ahead of and behind schedule, testified that Plaintiff was assigned the so-called "lift gate" routes more often than slower white drivers. Davila Dep. at 63-65; PSOAF ¶ 39. William Joseph, a black driver, PSOAF ¶¶ 1, 15, also testified that he and Plaintiff drove lift gate routes more frequently than white drives. Joseph Dep. at 37-38. Lift gate routes are where the package recipients lack a dock, such as residential homes. Harris Dep. at 341. Because the drivers must off-load the cargo manually when there is no dock, many drivers, including Plaintiff, view lift gate routes as undesirable and as a tool of punishment used by supervisors. PSOAF ¶¶ 14, 16; Harris Dep. at 341-42; Yang Dep. at 64-65.

The record is not clear how lift gate routes were intended to be distributed among drivers. Mr. Vande Hei testified that drivers "cycle in and out" of the lift

gate routes, and that while some drivers may be assigned to lift gate routes more frequently than others, the company tries to "cycle them all as best as we can." Vande Hei Dep. at 173-74; *see also* PSOAF ¶ 15. By comparison, Mr. Joseph testified that when Mr. Vande Hei became the facility manager, he changed the procedure for assigning lift gate routes. Joseph Dep. at 23-24. Before, drivers typically were assigned different routes from one day to another; after, drivers typically drove the same routes each day. Joseph Dep. at 23-24. Based on this incomplete record, when and why this change in procedure occurred and its implications are questions for the jury.

Defendants point to *Hobbs*, 573 F.3d at 464-65, to argue that Plaintiff's job assignments cannot create a hostile work environment because they are part of his job duties. [86] at 10-11. While a fair point, the facts here are more nuanced. The argument here is not that Plaintiff never should have been assigned lift gate routes, but rather that his assignments were administered in a discriminatory fashion, as shown by the above testimony from Mr. Davila and Mr. Joseph.

Next, the record contains testimony from other minority employees who allege they too experienced racial discrimination at the Aurora Service Center. At trial, this might constitute appropriate circumstantial evidence to show a hostile work environment. *Yancick*, 653 F.3d at 545; *Williams*, 2014 WL 5543826, at *10 (collecting cases); *cf. Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008). For example, Mr. Tyler, also a black driver, testified that when white drivers were also in the cafeteria along with him, Mr. Mills and others told Mr. Tyler that

he had to leave.  PSOAF ¶¶ 1, 9, 23.  Mr. Tyler added that supervisors would stare at minorities when they saw them in the cafeteria.  PSOAF ¶ 9.

There is even more evidence in the record that may support Plaintiff's hostile work environment claim, such as Mr. Vande Hei not allowing Plaintiff to post literature about black pioneers in honor of Black History Month and Mr. Vande Hei placing Aurora Service Center on "Red Alert" due to a perceived threat from Plaintiff, [84] at 5-7, but this Court need not address that evidence.  This Court has said enough in finding a disputed issue of material fact as to Plaintiff's hostile work environment claim.

Last, there is no dispute that the fourth element is met, and probably with good reason.  FedEx Freight, as the employer, is strictly liable if its employee's supervisor created the hostile work environment.  *Hrobowski*, 358 F.3d at 477-48; *Mason*, 233 F.3d at 1043.  Here, Plaintiff complains about harassment from his supervisors, including the Service Center Manager and Operations Supervisors.

### B.  Racial Discrimination (Counts I and II)

Also in Counts I and II, Plaintiff argues that he was terminated because of his race, and brings this claim against all Defendants.  Under Title VII, it is unlawful for any employer "to discharge any individual … because of such individual's race."  42 U.S.C. § 2000e-2.  Thus, here, Plaintiff must show that Defendants had a discriminatory motive in terminating his employment.  *Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 695 (7th Cir. 2006); *see also Cerros*, 288 F.3d at 1044.

In resisting summary judgment under Title VII, Plaintiff has two available methods of showing discrimination: the direct method and the indirect method. Here, Plaintiff proceeds under the direct method only, [84] at 10-11, contrary to how Defendants brief the issue, [77] at 8-10; [86] at 2-6. Accordingly, some of Defendants' arguments, such as whether Plaintiff has shown that similarly situated white employees were treated better, are rendered irrelevant to the degree they address the indirect method. *See Hasan*, 552 F.3d at 529-30 & n.4.

To prevail under the direct method, Plaintiff is not limited to near-admissions by his employer but also can present circumstantial evidence which suggests discrimination, albeit through a longer chain of inferences. *Hasan*, 552 F.3d at 527. Nevertheless, Plaintiff must still construct a "convincing mosaic" of circumstantial evidence that allows the jury to infer intentional discrimination. *Hasan*, 552 F.3d at 527; *Jordan v. City of Gary, Indiana*, 396 F.3d 825, 832 (7th Cir. 2005). There are three general categories of circumstantial evidence: (1) suspicious timing, ambiguous oral and written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not statistically rigorous, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence where the employee was qualified for and fails to receive the desired treatment, and the employer's stated reason for the difference is unworthy of belief. *Hasan*, 552 F.3d at 527, 529-30 n.4; *Troupe v. May Department Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Each category of evidence can be sufficient by itself. *Troupe*, 20 F.3d at 736.

Here, beyond just the evidence supporting Plaintiff's hostile work environment claim, some of which also is applicable here, Plaintiff advances additional circumstantial evidence to show that his termination was due to his race. [84] at 5-6, 10-12.

Plaintiff focuses his argument on rebutting the validity of the purported basis of his termination: two Compensated Time Violations in six months. *See* [84] at 11-12. For both, Plaintiff disputes that he really was at fault and offers his explanation of those events. PSOAF ¶¶ 20-21, 25.

This Court declines to address the merits of Plaintiff's termination at length at this time given the other, sufficient evidence in the record supporting his racial discrimination claim at this stage in the proceedings. Moreover, Defendants correctly argue, *see* [86] at 3-4, that the real issue is not whether the reasons FedEx gave for terminating Plaintiff were right or wrong but rather whether the company honestly believed them. *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052, 1056 (7th Cir. 2006); *Ptasznik*, 464 F.3d at 697. The fact that Plaintiff may be able to show that FedEx Freight incorrectly terminated his employment does not necessarily show, without more, that the decision was based on race. *See Luks*, 467 F.3d at 1056. This is not to say that attacking the strength of the reason the employer gave for termination has no relevance under the direct method (namely, to show pretext), but rather that Plaintiff should bear in mind that his ultimate burden is to show a discriminatory reason for his termination, not that Defendants made a bad decision in terminating him. *See Hasan*, 552 F.3d at 527.

Much of Plaintiff's analysis fails to connect his termination with his race; and, by way of example, this Court addresses Plaintiff's argument that the timing of his termination is the "most suspicious" evidence of Defendants' discrimination. [84] at 12. The record shows the following timeline:

- August 15, 2012. The second Compensated Time Violation occurred, and an investigation ensued.

- August 20, 2012. Mr. Maco, Mr. McCready, Mr. Paoletti and Mr. Vande Hei interviewed Plaintiff about the August 15, 2012 incident.

- August 23, 2012. Plaintiff testified that Mr. Vande Hei called him and asked him to return to work. Harris Dep. at 279; DSOF ¶ 51. On an unknown date (perhaps also August 23), Plaintiff testified that he brought a letter from his doctor stating the Plaintiff could not return to work and Mr. Vande Hei told Plaintiff that he should return to work to not undermine FedEx Freight's "injury quota." Harris Dep. at 280-81.

- Unknown date. Mr. Maco, Mr. Jenkins and Mr. Vande Hei jointly agreed to terminate Plaintiff. DSOF ¶ 45. The parties do not identify when this decision occurred. The decision was reviewed by the Legal Department, Maco Dep. at 107-08, presumably before being executed. When Mr. Vande Hei was asked if there were any conversations among managers and supervisors about Plaintiff between August 20, 2012 and his termination, Mr. Vande Hei testified that he "may have talked" to Mr. Maco about "our next move" with respect to Plaintiff's employment sometime between August 20 and 28, 2012. Vande Hei Dep. at 286; PSOAF ¶ 32.

- August 28, 2012. FedEx Freight terminated Plaintiff. Mr. Vande Hei answered "I don't know" when asked why FedEx Freight waited until August 28, 2012 to terminate Plaintiff when the second Compensated Time Violation occurred on August 15, 2012. Vande Hei Dep. at 287.

This timeline, by itself and based on the present record before this Court, does not lend itself to a strong inference of discrimination. Plaintiff has not shown that a two-week lag between the second Compensated Time Violation and his termination is so long as to infer a pre-textual reason for Plaintiff's termination,

indeed, the timeline belies that inference based on the time required to investigate the violation and then form and implement a sanction. Nor has Plaintiff proven that Mr. Vande Hei asked Plaintiff to come back to work at a time after the company decided to terminate his employment. Similarly, in *Ptasznik*, 464 F.3d at 695, the Seventh Circuit rejected the inference that certain improper statements showed that the employee's termination was the product of age and national origin discrimination. As here, the employee in *Ptasznik* failed to piece together a proper timeline of events to support that inference. *Id.*

Another argument that fails to warrant an inference of discrimination is Mr. McCready and Mr. Mills purportedly scrutinizing Plaintiff's driving times but not those of other drives. Plaintiff states that Mr. McCready and Mr. Mills were "actively looking at their computer screens to single out a particular driver to scrutinize whether there is a delay." [84] at 12. But the underlying record, including the relevant statements of fact cited by Plaintiff, does not support that proposition. *See* PSOAF ¶¶ 22-24.

But Plaintiff is not left with nothing. The record supports a plausible argument (although perhaps one just barely strong enough to survive summary judgment) that Plaintiff was either "set up" to fail or that Defendants, including Mr. Vande Hei who was involved in the decision to terminate Plaintiff, considered race when deciding to terminate him. *Cf. Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 905 (7th Cir. 2006) (crediting a "set up" theory in the context of a retaliation claim).

First, as to the first Compensated Time Violation, Plaintiff argues he was assigned to the Elmhurst Service Center as a form of racially-motivated punishment. Harris Dep. at 328-30; PSOAF ¶ 19. Ms. Felber was the supervisor at the Elmhurst Service Center in March 2012. PSOAF ¶ 19. Ms. Felber previously worked at the Aurora Service Center and, in 2009, Plaintiff complained that Ms. Felber had discriminated against him because he and two white employees fell asleep during a meeting, yet only Plaintiff was disciplined. Harris Dep. at 219-20; PSOAF ¶ 19. Plaintiff testified that he was assigned to the Elmhurst Service Center on March 29, 2012 even though "we [Plaintiff and Ms. Felber] [were] supposed to have been sort of separated," Harris Dep. at 328-29, and Plaintiff should have been able to choose a different route due to his seniority, Response to DSOF ¶ 23 (citing Harris Dep. at 106-07).

In this regard, this case is ostensibly analogous to *Jordan*, 396 F.3d at 828, 832-33, an age and sex discrimination case where the Seventh Circuit affirmed summary judgment in favor of the employer but nonetheless found persuasive the terminated employee's (a 60 year-old black woman) argument that the supervisor intentionally required two other older woman to work together despite the animosity between the two. The Seventh Circuit found that behavior "suspect" and commented that had the record not shown that the employee's department was being restructured, that behavior "may induce a finding of discriminatory intent." *Id.* at 832.

Second, the record contains evidence showing that supervisors at the Aurora Service Center may have treated black drivers who drove slowly differently than their slow white counterparts. Mr. Davila began attending manager meetings around 2010, when he was promoted to the position of dock supervisor. Davila Dep. at 61. Mr. Davila testified that Mr. Mills, Mr. Paoletti and Mr. Vande Hei (all white) named Plaintiff and Mr. Tyler (both black drivers) as slow drivers and discussed their performance during management meetings. Davila Dep. at 58-64. White drivers who were slower than Plaintiff, however, were not named by the supervisors. PSOAF ¶ 39.

In the same vein, Plaintiff also argues that the record shows racial discrimination from the purported absence of other drivers incurring Compensated Time Violations, [84] at 11, but this argument does not get Plaintiff very far. Mr. Vande Hei did not recall any Compensated Time Violations at the Aurora Service Center on or before 2012, when Plaintiff was reprimanded; and further testified that he did not know how often drivers got lost and, to that point, did not recall any instances of drivers getting lost. PSOAF ¶ 37. Mr. Baxter, the former HR Advisor, testified that he had no specific recollection of Compensated Time Violations at the Aurora Service Center while Plaintiff was employed there. Baxter Dep. at 91-92. Based on his supervision of more than 80 centers, Mr. Baxter estimated that a center of comparable size as the Aurora Service Center would have more than one violation per year. PSOAF ¶¶ 37-38. These facts perhaps show, at best, that Plaintiff was singled out, but, without more, they lack overtures of racial

discrimination.  For example, Plaintiff has not shown that black drivers were cited with Compensated Time Violations at a higher rate than white drivers.  Base statistics of Compensated Time Violations, without evidence to put the numbers in context, are not informative in inferring discrimination.  *See Hemsworth v. Quotesmith.com*, 476 F.3d 487, 491-92 (7th Cir. 2007).

Third, as discussed in the hostile work environment section (Section II.A), the record contains other evidence of racial discrimination, in particular, the evidence indicating that Mr. Vande Hei discriminated against black drivers.

For these reasons, summary judgment is denied as to Plaintiff's racial discrimination claim in Counts I and II.

## C.     Retaliation (Counts I and II)

Finally in Counts I and II, Plaintiff brings a retaliation claim against all Defendants, arguing that they retaliated against him for bringing internal complaints about the racial discrimination he encountered at FedEx Freight. Plaintiff again seeks to prove his retaliation claim under the direct method, which requires him to show that (1) he engaged in statutorily protected activity; (2) his employer took a materially adverse action against him; and (3) there was a causal connection between the two.  *Malin v. Hospira, Inc.*, 762 F.3d 552, 558 (7th Cir. 2014); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012).  The third element requires Plaintiff to show but-for causation, meaning that Plaintiff would not have been terminated had he not complained about racial discrimination. *Malin*, 762 F.3d at 562 n.3.

There is no dispute that the first two elements are satisfied. Plaintiff brought multiple internal complaints of discrimination, Harris Dep. at 367-68; DSOF ¶ 62; PSOAF ¶ 40, and was terminated effective August 28, 2012, DSOF ¶ 45; Termination Letter [73]. Plaintiff testified:

> Q. Okay. And you believe that your termination was also in retaliation for your complaints about discrimination?
>
> A. Yes.
>
> Q. What are your facts about that?
>
> A. Well, I got terminated about me complaining to Roger [Maco] and complaining --
>
> Q. So the one followed the other; is that what you're saying?
>
> A. Yeah, I complained to Dennis [Moriarty]. I complained to Roger [Maco]. I complained to Stuart [Baxter]. And then after complaining to them and threatening to go to the EEOC, I threatened Bob [Vande Hei] with going to the EEOC, I did say I was going to tell somebody. And he will always say, I don't care if Stuart is your friend and you've got family members. I don't care. Go call Dennis. He would tell me that all the time.
>
> Q. Any other facts to support your claim that your termination was due to retaliation for complaints about discrimination?
>
> A. That was it as far as I know. I complained to them.

Harris Dep. at 367-68; DSOF ¶ 62; PSOAF ¶ 40.

These complaints started on or before January 2011 and continued until at least June 2012. Mr. Baxter testified that on two to four occasions, Plaintiff complained to him about racial discrimination. Baxter Dep. at 95. Mr. Baxter did not remember the dates of these conversations but said they occurred while he was a HR Advisor, which was until January 31, 2011. Baxter Dep. at 95; DSOF ¶¶ 20-21. Mr. Maco confirmed that Plaintiff complained to him in June 2012 about Mr.

Courter.  DSOF ¶ 31.  The parties have not identified when the complaints to Mr. Moriarty and Mr. Vande Hei occurred.

While Plaintiff has met the first two elements, he has failed to meet the third element: causation.  Plaintiff has not successfully connected his racial discrimination complaints to his termination.

Plaintiff alludes to the suspicious timing between the complaints and his termination.  [84] at 12-13.  But suspicious timing alone rarely is enough at summary judgment.  The general rule in this Circuit is that employees cannot survive summary judgment in the face of long intervals between the protected activity and the adverse employment action unless additional circumstances show a causal nexus.  *See, e.g.*, *Malin*, 762 F.3d at 560; *Harper*, 687 F.3d at 308; *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011).  Intervals as short as two months (and even shorter) are too long to carry an inference of discrimination or create any triable issue of fact.  *Harper*, 687 F.3d at 307 n.31 (two month gap, and collecting Seventh Circuit cases with six and seven-week gaps).

Here, Plaintiff began complaining about racial discrimination at least 18 months before he was terminated; and the last identified complaint occurred two months before his termination.  The timing of these complaints without more is far too removed from his termination to show a casual nexus.  *See Harper*, 687 F.3d at 307 n.31.  Plaintiff responds that the Seventh Circuit has found a viable retaliation claim where there was a multi-year gap between the original protected activity and the retaliatory act.  [84] at 13 (citing *Malin*, 762 F.3d 552).  But in *Malin*, the

employee bridged the three-year time gap by showing that her supervisor repeatedly denied her promotions during that time despite substantial evidence that the employee deserved one. 762 F.3d at 560-62. No comparable evidence is present in the record here.

In the alternative, perhaps there were complaints more recent than June 2012, but the burden was on Plaintiff to identify them in response to summary judgment. He did not, and this Court is under no obligation to scour the record to save Plaintiff's claim for him. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

Even if there were more recent complaints, Plaintiff has not answered why they would have suddenly triggered retaliation—and not one of his other prior complaints. *See* [84] at 12 (acknowledging that Plaintiff "repeatedly and consistently" complained about discrimination). In this respect, this case is analogous to *Leitgen*, where the employee also made multiple discrimination complaints, yet the employer prevailed on summary judgment. Proceedings to terminate the employee in *Leitgen* began just days after the employee last complained of gender discrimination; and, from that timeline, which is more convincing than the one here, the employee drew an inference of retaliation. 630 F.3d at 672-73, 675. The Seventh Circuit disagreed, however, because the discrimination complaints had begun years earlier and the employee had not offered a valid reason why her last complaint suddenly triggered retaliation. *Id.* at 675-76. The same is true here.

For these reasons, summary judgment is granted as to Plaintiff's retaliation claim in Counts I and II.

### D. Fair Labor Standards Act (Count III) and Illinois Minimum Wage Law (Count IV)

In Counts III and IV, Plaintiff, an hourly employee, alleges that Defendants required him to work off-the-clock several times during 2011 to 2012, but did not pay him overtime for that work. DSOF ¶¶ 64-66. Plaintiff brings Count III against all Defendants and Count IV just against FedEx Freight.

The Fair Labor Standards Act provides that an employee who works more than 40 hours in a week must be paid for the excess hours at one and one-half times the regular rate of pay. 29 U.S.C. § 207(a)(1); *see also Brown v. Family Dollar Stores of Indiana, LP*, 534 F.3d 593, 594 (7th Cir. 2008). The employee bears the burden of proving that he performed uncompensated overtime work. *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011); *Brown*, 534 F.3d at 594-95. When the employer's records do not provide the accurate record of time worked, as here, the employee must produce sufficient evidence to show the amount and extent of the uncompensated work as a matter of just and reasonable inference. *Brown*, 534 F.3d at 595 (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)). The burden then shifts to the employer to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference to be drawn from the employee's evidence. *Brown*, 534 F.3d at 595 (same internal citation).

The relevant analysis here under the Illinois Minimum Wage Law, 820 ILCS 105, mirrors that for the Fair Labor Standards Act. *Driver v. AppleIllinois, LLC*, 917 F. Supp. 2d 793, 798-800 (N.D. Ill. 2013) (collecting cases). Neither party asks this Court to analyze the statutes separately.

To meet its burden, the employee can prove the number of hours worked indirectly, through triggering factors that signal extended work hours. *Brown*, 534 F.3d at 597. The Seventh Circuit in *Brown* gave the example of an employee unable to document her overtime work exactly, yet who knew that she worked overtime when there were after-school ice cream sales and dances. *Brown*, 534 F.3d at 597 (citing *Allen v. Board of Public Education for Bibb City*, 495 F.3d 1306, 1317 (11th Cir. 2007)). Since the dates of those events could be readily ascertainable from the employer's records, the Seventh Circuit found a sufficient basis for inferring the extra hours worked. *Brown*, 534 F.3d at 597-98.

Here, Plaintiff argues that he was instructed not to record his time for two categories of work. *See* PSOAF ¶ 18. First, in 2011 and 2012, Mr. Hammittee, Mr. McCready and Mr. Mills instructed Plaintiff to swipe out before delivering empty trailers to "Cannon" (a customer). Harris Dep. at 362, 364, 366. The deliveries took 15 to 30 minutes for a single trailer; more time if there were two trailers. Harris Dep. at 365; DSOF ¶ 64. Plaintiff estimated that this happened five to eight times; and further explained that sensors (presumably at the Aurora Service Center) would have caught and recorded the dates and times when trailers were removed.

Harris Dep. at 362, 365-66. This is analogous to the triggering factor found sufficient in *Brown*.

Second, Plaintiff testified that when he filled-in as a Road Driver, he was told on multiple occasions (presumably here either by Roger Vande Hei or Roger Maco) to punch out before completing the required post-trip driver's logs. Harris Dep. at 384-85. It took 15 to 20 minutes to complete the driver's logs, and Plaintiff testified that he completed the logs off-the-clock a "few times." Harris Dep. at 385-87; DSOF ¶ 66.

Defendants first challenge the form of Plaintiff's testimony. Defendants incorrectly argue that this testimony is too vague to survive summary judgment. [77] at 13-14. In fact, Defendants have cited two cases from this District that confirm that summary judgment should be denied under similar facts. *Id.* The Court in *Cardenas v. Grozdic*, No. 12-292, 2014 WL 4435397, at *6 (N.D. Ill. Sept. 9, 2014), denied summary judgment as to the Fair Labor Standards Act claim because, as here, the employee's deposition testimony alone created a triable issue of fact. Despite lacking documentary support, the employee (a handyman) testified that his employer prepared work invoices in a haphazard fashion that understated the number of hours worked. *Id.* at *2-3, 6. Likewise, in *Skelton v. American Intercontinental University Online*, 382 F. Supp. 2d 1068, 1072, 1078-79 (N.D. Ill. 2005), the Court denied summary judgment as to the Fair Labor Standards Act claim even though, as here, the employees did not personally maintain documents showing the excess hours they worked but did not record. Similar to here, the

employer in *Skelton* instructed the employees to record on their time sheets no more than 40 hours of work per week. *Id.* at 1071-72.

Defendants also discredit Plaintiff's "uncorroborated and self-serving testimony … [as] insufficient as a matter of law." [86] at 14-15. That also is incorrect. Deposition testimony by its very nature is self-serving, *Hills v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013), and a jury could reasonably believe Plaintiff's testimony about when he worked and clocked in and out. Moreover, the Seventh Circuit has "long held" that a Plaintiff's own deposition testimony alone can defeat summary judgment. *Paz v. Wauconda Healthcare & Rehabilitation Centre, LLC*, 464 F.3d 659, 664-65 (7th Cir. 2006).

In addition, Defendants raise two factual issues that warrant discussion. [77] at 13-14. Defendants argue that Road Drivers are paid by the mile and not by the hour, but their evidence does not go that far. Defendants submit an affidavit from Mr. Vande Hei who stated that City Drivers who fill-in for Road Drives "primarily"—but not exclusively—are paid by the mile and not by the hour:

> Road Drivers are paid by the miles they drive, not by the hour. The Road Driver mileage rate is designed to compensate them for their time driving and completing any paperwork, including road logs. City Drivers are typically paid by the hour. But City Drivers who occasionally fill-in to perform Road Driver runs are paid primarily by the miles they drive, and not by the hour.

Vande Hei Aff. [73] ¶ 5. Mr. Vande Hei also testified that Road Drivers (unlike City Drivers) are not "on-the-clock" when filling out driver logs because that time and effort is built into the mileage pay. Vande Hei Dep. at 241.

Possibly consistent with Mr. Vande Hei's affidavit, Plaintiff explained that the policy at FedEx Freight was to pay by the mile for long trips but not short trips. Harris Dep. at 473. Plaintiff—a City Driver (DSOF ¶ 11)—testified that when he filled-in for a Road Driver, he clocked-in and FedEx Freight paid him by the hour because his trips were short. Harris Dep. at 472-73.

Defendants also argue that Plaintiff admitted that he did not have a claim for unpaid overtime, [77] at 14; DSOF ¶ 69, but they misstate his testimony. When asked if there were any weeks where he exceeded 40 hours and was not paid overtime, Plaintiff answered: "I'm not sure." Harris Dep. at 389. While that answer weakens Plaintiff's claim, it does not eliminate it altogether, particularly where the hours that Plaintiff worked should be a matter of documentary evidence as well.

For these reasons, summary judgment is denied as to Counts III and IV.

### E.     Family and Medical Leave Act (Count V)

In Count V, Plaintiff alleges that he should have received a leave of absence under the Family and Medical Leave Act ("FMLA") for the injuries he sustained on August 20, 2012, and that he should not have been asked to return to work. DSOF ¶ 70. Plaintiff brings this claim against FedEx Freight, Mr. Maco and Mr. Vande Hei only.

The FMLA provides separate causes of action for retaliation or interference with entitlements under the statute. 29 U.S.C. § 2615(a)(1) (interference) and (a)(2) (retaliation). To prevail on an interference claim, as here, Plaintiff must establish that (1) he was eligible for the FMLA's protections; (2) his employer was covered by

the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) his employer denied him FMLA benefits to which he was entitled. *Goelzer v. Sheboygan County, Wisconsin*, 604 F.3d 987, 993 (7th Cir. 2010).

Here, Plaintiff proceeds under a theory of interference only, claiming that his wrongful termination deprived him of his FMLA benefits. [84] at 13-14. Both parties focus their efforts disputing whether Defendants terminated Plaintiff because he asserted rights under FMLA, but that issue is a red herring. As the Seventh Circuit made clear in *Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884-85 (7th Cir. 2005), while a retaliation claim requires proof of discriminatory intent, an interference claim requires only proof that the employer denied the employee his statutory entitlements. The proper inquiry for an interference claim thus is whether the employer respected the employee's entitlements, that is, an employee can proceed with an interference claim even if the employer terminated him "*in spite of* his rights under the FMLA, not *because* he asserted [them]." *Id.* at 885 (emphasis in original).

In *Kauffman*, there was no dispute that the employer, like here, terminated the employee because he was argumentative and a troublemaker, and not because he sought leave under FMLA. 426 F.3d at 885. There also was no dispute in *Kauffman* that the employee was treated no differently than his colleagues who were not entitled to FMLA leave. *Id.* Yet that was not fatal to the employee's claim at summary judgment—neither fact actually bore on the employee's interference

claim. *Id.* at 884-85, 887. The real inquiry was whether FedEx had respected the employee's FMLA entitlements. *Id.* at 885.

There, of course, remains the issue of whether Defendants interfered with Plaintiff's FMLA entitlements, but this issue has not been properly developed in the motion papers. [77] at 15; [86] at 13-14; *see Mitsui Sumitomo Insurance Co., Ltd. v. Moore Transportation, Inc.*, 500 F. Supp. 2d 942, 956-57 (N.D. Ill. 2007). Accordingly, summary judgment is denied as to Count V.

F.  **Illinois Workers' Compensation Act (Count VI, Defendant FedEx Freight)**

In Count VI, Plaintiff alleges that FedEx Freight terminated him in retaliation for seeking to file a workers' compensation claim. To prevail on a claim for retaliatory discharge under the Illinois Workers' Compensation Act, 820 ILCS 305, Plaintiff must prove that: (1) he was an employee before the injury; (2) he exercised a right granted by the Illinois Workers' Compensation Act; (3) he was discharged; and (4) the discharge was casually related to his filing a claim under the Act. *Beatty v. Olin Corp.*, 693 F.3d 750, 753 (7th Cir. 2012). Concerning causation, the ultimate issue to be decided is the employer's motive in discharging the employee. *Id.*

Here, Plaintiff was injured on August 20, 2012 and was terminated effective August 28, 2012. Sometime in between, Plaintiff told Mr. Vande Hei that he intended to file for workers' compensation and Mr. Vande Hei responded by threatening: "you need to come back, [or] else you can be fired." Harris Dep. at 398; *see also* PSOAF ¶ 30. According to Plaintiff, Mr. Vande Hei said that a new claim

would "mess with our [the company's] numbers." Harris Dep. at 397; *see also id.* at 401-02. Mr. Vande Hei was one of the three persons involved in the decision to terminate Plaintiff. DSOF ¶ 45.

FedEx Freight responds that Plaintiff was terminated because of his two Compensated Time Violations, [86] at 14, but, in light of Mr. Vande Hei's purported statements, the true reason for Plaintiff's termination is for the jury to decide. Summary judgment is denied as to Count VI.

## IV. Conclusion

Defendants' motion for summary judgment [66] is granted in part and denied in part. Specifically, judgment in favor of Defendants is granted as to the retaliation claim in Counts I and II only, so all other claims remain: hostile work environment (Counts I and II); racial discrimination (Counts I and II); Fair Labor Standards Act and Illinois Minimum Wage Law (Count III and IV, respectively); Illinois Workers Compensation Act (Count V); and Family and Medical Leave Act (Count VI).

Dated: June 17, 2015

Entered:

_____
John Robert Blakey
United States District Judge

38